The essential issue in this case is whether the exclusionary rule, with its twin goals of deterrence and judicial integrity, has any meaningful application in a case involving an illegal alien like the defendant. The government says no in a brief that amounts essentially to an argument of, so what? So what if the government violated Mr. Morales-Puerto's Fourth Amendment rights when they detained him without authority and in violation of Oregon law? So what if the government violated Mr. Morales-Puerto's Fifth Amendment rights when they questioned him without Miranda warnings? According to the government, these constitutional violations have no remedy. That is not and should not be the law. Well, there could be a remedy, and that is suppression of the statement that Morales made to the ICE officer. Billingson. Billingson. But that doesn't necessarily mean that evidence of his identity cannot be admitted. And that's the problem, isn't it? So if the first encounter was consensual, they know who he is, the facts relevant to his identity are known, and you track those facts out, and it leads to his hate file, and the rest is history. Well, Your Honor, of course we wouldn't acknowledge that the first encounter was consensual, but even assuming that at the moment, Your Honor, I believe that in this case, then the government suppressed the defendant's statements. That was where we requested, and Mr. Morales-Puerto What difference would that have made? Well, Mr. Morales-Puerto might have chosen to go to trial and put the government to its burden of proof if they weren't able to say to the jury, here's the defendant's own admission. Well, they should have. What difference does it make? I guess the real part of it is if you suppress the statements, the statements are in the hate file. I mean, you know who he is, you've got his hate file, all of the deportation records are in the hate file and are far more reliable as it were than his statement that I not been courted a couple of times or whatever. Well, Your Honor, there shouldn't be a separate rule for Hispanic or other aliens and whether their statements get suppressed as against any other defendant, and in many cases, a defendant's statement I don't think that's the question. The question has to do with harmless error, in a sense, because assuming that the statements should be suppressed, why is the result ultimately any different if the fingerprints are permissible and tie him to his identity and his previous file with or without statements? How could that help him? Well, let me try to address three aspects of that. First, the court's making a harmless error, and I don't believe they put on that evidence in the district court. For example, we don't know what the government said at the plea hearing to say, here's the proof we would have of Mr. Morales-Correco's guilt. Mr. Morales pled guilty on a conditional guilty plea, and the contract with the government is that if his statements should have been suppressed and the court should have granted the motion to suppress, then he should be allowed to withdraw his guilty plea and be back in a position of having his statements suppressed. Now, maybe the government's case is overwhelming based on the hate file, maybe not. If his own statements are taken out of the hate file, however, that's a significant change in the government's evidence. They wouldn't have the defendant's own statements to this agent saying, I was born in Honduras. The point is, Ms. Hay, if you could just tell, I understand your policy argument, but at the moment, you're saying, look, they know his identity. That leads to the hate file. Correct. Fingerprints can be obtained. They obtained fingerprints after he was arrested by ICE, but they could also be obtained for trial purposes. So the hate file says everything that his statements said, only in a more authoritative way, because it's documents showing that he was deported, presumably more times than he had even admitted. Your Honor, I think that's correct that there's significant evidence in the hate file. However, it's the defendant's decision whether to go to trial and put the government to the burden of proof or whether he should plead guilty. And in this case, some of the evidence the government chose to hold against him was his own verbal statements to the immigration officer who could say, this defendant told me these things. Why would that be material? Why would that be material to pleading guilty? Your Honor, I would try a case in some circumstances in which the defendant had made no statements admitting alienage, admitting any guilt, and the government had to prove using very bureaucratic records that this defendant was guilty. No, but the admission of alienage is okay. What's not okay is the admission of, or arguably what's not okay is the admission of deportation. Well, I would contend the admission of alienage should also not be admitted as the defendant making that statement, Your Honor. I think the distinction here is that once the government learns the defendant's identity, they're permitted to use that knowledge to then go back, get the hate file, and use it. But are they permitted to use the defendant's own words? Are they permitted to say, this defendant told me these facts? Look, let's just humor me and understand what I'm saying. Assume they cannot use his words, okay? Just toss his words. They know who he is. That leads to, and they can get his fingerprints, and they can get to the hate file. Forget all of his words. So what difference does it make? I think that's a hypothetical that we would have to go back to the district court to address. What difference would it make? Perhaps the government would not choose to prosecute a case in which this court said constitutional rights were violated, that Oregon law was violated, that something happened here, that the government's not required to bring, to continue that prosecution. Perhaps Mr. Morales-Berger would decide to go to trial. Those are hypotheticals that we don't know. The key, it seems to me, that you're hanging your hat on is the paragraph in the plea agreement that says, if on appeal it's determined that the statement should have been suppressed, I get to withdraw my guilty plea. Yes. That's really what you, as I understand the thrust of your argument, it is, that's the bargain that he made, whether we think it's a good bargain or not, that if, am I correctly? That's correct, Your Honor, that that's under the federal rules, it's a conditional guilty plea. If his statement should have been suppressed, then under Rule 11A-2, I believe it is. I think that's paragraph 5 of the agreement, at year 129. And he should be permitted to withdraw his guilty plea at that point. Yeah. He will be allowed to withdraw if he prevails on the appeal of the motion to suppress. And that's based on the federal rules of criminal procedure that has a specific rule for that. And so that's... He can't suppress his energy, that's the point. He can suppress the statement, but not his Well, I believe at that point the government would need to go back and figure out how they were going to prove their case and if they wanted to continue proving their case. They can prove their case by putting it on the A file. They have to have an agent testify to the A file at our... That's not a problem. Look, you know, are you basically representing that your office's position is that he is A, entitled to withdraw his guilty plea, and he will withdraw his guilty plea even though they know what he is, even put on evidence in the A file? Yes, Your Honor, I believe he is entitled to withdraw his guilty plea because his motion to suppress should have been granted, and that if the court, this court... At least in part. And I think that's, to me, part of the difficult question is it does appear that some of the And the agreement doesn't really speak to what happens if part of it's okay and part of it isn't. Possibly it would have been easier if we had filed three separate motions to suppress about each separate encounter, but essentially the argument was there were separate encounters that all violated the Constitution. Some of them required overlapping evidence to be suppressed. In this case, Your Honor, I believe the motion to suppress regarding the statements clearly should have been granted. Regarding the fingerprints and the photograph, we can continue to argue. I believe those should have been suppressed as well. In any event... Well, if we disagree with you on that, and let's assume for the sake of this question that the statements should have been suppressed, but the fingerprints not, what is the proper interpretation of the plea agreement in that circumstance? I think in that event, Your Honor, this Court would be reversing the district court's denial of the motions to suppress and vacating with instruction to grant in part and deny in part. And because this Court would be reversing the district court's decision... In part. Under my hypothetical, only in part. Right. Reversing in part. I guess I haven't read decisions before that say reverse in part. They would say reversing and ordering to grant in part. Well, but the problem is there are several things going on here, not just one thing. And the plea agreement has one paragraph, as I understand it, one paragraph, that deals with suppression, and that's paragraph five. And it says if we get to argue on appeal about suppression, and if we win, he will be allowed to withdraw his plea. But what it doesn't provide for one way or the other is if he wins a little bit and loses a little bit, what's the agreement? Your Honor, the question is what's the definition of prevails on this appeal? And I would say if you reverse in part, that would be considering prevailing on the appeal. I don't have in front of me the text of Rule 11A2. It perhaps has the same language of prevails on appeal. But I didn't research that issue or attempt to brief it, but I would think if the court even reverses or changes the district court's order in any way, that should be considered prevailing on the appeal, especially because in our situation, I think the statements are the most important element. That's the words of the defendant himself that are being used to convict him, and that's the part that makes a trial, of course, extremely difficult, that when you have the defendant's ---- He made two statements about prior deportation, the first one before he was Mirandized and the other one after he was Mirandized. Is it your position that both of those should be suppressed? Your Honor, I found the record unclear about what statements the defendant made prior to being Mirandized. Well, he was asked his identity, and Billison asked him, have you been deported before, and he answered yes. And then Billison stopped and gave him his, as I remember the record, gave him his Mirandized warning, and then he asked him again. Now, there's some cases that say that if there's a conscious plan or design to make a two-step statement to get around the Miranda warning, then the second statement can't come in, but this isn't that, is it? Your Honor, I think this is that circumstance, and I would point out there's two different arguments to suppress the statements, and I'll address yours. That's based on Miranda, but the other reason to suppress the statements is based on the violation of Oregon law, that the officer should not have stopped him to begin with. He shouldn't even have been there because that's a violation of Oregon law to have detained him, and the statements are the fruit of that illegal seizure, which I don't want to lose that point. But on the Miranda issue, Your Honor, it's true that the ICE agent first asked him questions about deportation, and then back at the station, Mirandized him, asked him the same questions. Under Siebert and then under this Court's decision in Williams, we have to assess whether those post-Mirandized statements should nevertheless come in, and as I argued in my reply brief, this case seems far from the circumstance considered in Siebert and Williams where statements could come in. In this case, and those cases set out a two-step test. The first is whether there was a deliberate attempt or a deliberate denial of Miranda rights at first, and then the second is whether there were any curative measures. The deliberate denial of Miranda rights is reviewed both objectively and subjectively, and the objective evidence the Court told us to look at is whether it's the same police officer or personnel who's done the questioning before and the questioning after. If it's different people, you might think, well, it might have been unintentional. They might not have been coordinated. In this case, it's the same officer. Williams' decision also told us to look at the timing, whether a significant amount of time had lapsed. In this case, not very much time lapsed. It may have been 15, may have been 30 minutes. We don't have a full record. So on that objective evidence, we can't say that this was not deliberate. Second, we have the subjective evidence. We have the testimony of the agent himself who did not say, I made a mistake, I intended to give Miranda warrants, I just goofed. He didn't say anything like that. He said, well, I considered it differently, and I decided I would not use Miranda warrants now because I thought this was civil, and then I went back and decided now it's criminal. But we know that that officer knew before he arrived that Mr. Morales Puerta was subject to criminal prosecution. He had already identified him. He had looked him up on the warrants. So he already knew that his questioning was going to elicit an incriminating statement. This wasn't a surprise. And the cases that we cited from this court earlier where they didn't suppress later statements involved somebody who wasn't considering that this might be a criminal prosecution and he was just surprised at the answer that he was eliciting. In this case, Agent Billingson, he knew when he asked about prior deportations that he was eliciting an incriminating statement. So on both the objective factors and the subjective factors, I think you have to say this was a deliberate use of two steps. It doesn't mean it was an evil intent. It doesn't mean the agent is trying to subvert Miranda. But his policy, his way of doing this was to ask questions first one way and then ask questions later. And the objective and subjective evidence shows that was intentional, that was deliberate. The second question is whether the agent then did anything to try to cure the lack of Miranda warnings before. And what the Supreme Court in this court has said is that a curative warning, for instance, saying what you said before isn't going to be used against you, that that would help. But nothing like that happened. And, again, there was not a long lapse of time. It was the same agent doing the questioning, and the subject matter overlapped. In some instances, they're covering really a different event in the second set of questioning, and so that's considered somewhat ameliorative. In this case, it's the same subject matter. And so, again, the second set of questioning should be considered the fruit of that first questioning. And then finally, Your Honor, the Miranda warnings that were given were actually watered down right after they were given by the statement on the top of the form, which says anything you say could be used in an administrative proceeding. That, I think, really undermines Miranda. Rather than being a curative warning that says here's your rights and make sure you understand them, it actually, in a way, makes them think that it's not going to be used in a criminal case because an administrative proceeding would be considered, say, an immigration court. So for all of those reasons, I think that the second statements after Miranda have to be suppressed just like the first. I alluded to the other reason for suppressing the statements, and that is the violation of Oregon law, that when the officers stopped Mr. Morales-Puerto on June 15th, they had no authority under the law to stop him and to detain him. And, in fact, they were explicitly prohibited from stopping him. And Oregon law, it's just not subject to doubt. It says that law enforcement agents may not expend personnel or equipment or resources to detect or apprehend someone whose sole violation is a violation of federal immigration law. And there are some exceptions that are written into the statute that are very clear. One of the exceptions is if there's a warrant for arrest signed by a federal magistrate for a criminal violation of immigration law. And that's very clear in this case. We don't have that. We have a civil warrant that the officers all know. It's civil. It's not criminal. It's not something they could arrest him on. And yet we had three patrol cars, four officers, uniformed with their guns, batons, using the radio, calling first to get the sergeant to come and see this illegal alien, then calling immigration to come and get this illegal alien. We don't know the whole amount of time, but it started at about 4 o'clock, and Agent Billenson started the questioning at his office at 5.20. There's about an hour and 20-minute time period there, and we know that the office is between 10 and 15 minutes away. So for a significant period of time, Mr. Morales-Puerto was held at the curb in violation of Oregon law for the sole purpose of alerting immigration authorities. Now, what can be done about that? That's a violation of the Fourth Amendment. Usually state law violations are not how we decide federal constitutional violations, but there's two exceptions under the Fourth Amendment. One is when it's an inventory search, and the validity and whether an officer followed a state's inventory policy is how we decide if that search was valid. And the second is if it's an arrest, because the Fourth Amendment doesn't specifically tell us what's a valid arrest, and so they look to state law. And I cited in my brief those cases. It's Shepard, Mota. There's just no doubt that the state authority to arrest is what determines whether an arrest, a seizure, is reasonable under the Fourth Amendment. In this case, the seizure was not reasonable, and we're left with police officers flagrantly violating Oregon law, concealing that violation by not writing a report, not creating any written record, turning the defendant over to the federal government for prosecution, and asking this court and the federal government to be complicit in that violation of law. That is not how the law should be perceived, and the evidence obtained as a result of that stop should be suppressed. I'll save my last minute, Your Honor, for rebuttal. Thank you. May it please the Court, Stephen Pfeiffer for the United States. Mr. Pfeiffer, I would like you to help me understand Paragraph 5 of the plea agreement. Excuse me. It seems to me that you have conceded that at least some of the statements should be suppressed. Right. So even if we don't agree with anything that the defendant has raised, other than the things you already have conceded and agree with, we have a situation in which some things are suppressible that were not suppressed by the district court. And the bargain that you struck was if on appeal the motion to suppress is allowed, the defendant is allowed to withdraw his plea. Whether that's a good bargain or not, whether he would be silly to do it or not really isn't my concern. It is rather how we interpret that. Does that mean any part of the motion to suppress is allowed on appeal or does he have to win everything to be allowed to withdraw his plea under that paragraph? I think a reasonable interpretation would be, assuming that they lose their argument about everything else, that it's sort of like the judge was right for the wrong reason. He was wrong for the very minimal statements that were made on the street. However, those same statements were repeated later in much greater detail at the ICE office. And so those statements are the same statements, they're just augmented. But that's not really what this says. It says, defendant's guilty plea, among other things here, allows him to appeal the court's denial of his motion to suppress statements and evidence. Right. And if defendant prevails on this appeal, he will be allowed to withdraw his guilty plea. So statements are part of that, clearly. And if he prevails, but how much does he have to prevail? I'm really asking what the bargain was, how we should make the government live by its bargain or how we should enforce this bargain when it's, from your own setting it out, some of this appeal should be successful. He should prevail at least in part, even under your own way of looking at it. I understand exactly what the court's saying. There's a middle way here which hasn't been mentioned, and that is if counsel continues to oppose the misability, and I'm sure that they will, of the second set of statements, then that may very well, under Williams, require a remand for Judge Hagerty to look at that. He didn't get that far because he thought, correctly I thought at the time, under Salgado, that those statements on the street were admissible and there was no Miranda violation. Now, if we go to the second step of the Williams case, then that would, I think, possibly, not necessarily would possibly require the court, the trial court, to look at it again to make factual comments. So that would basically put off the question to the future. Right. So there is a third way. I'm not advocating that as my first position. My first position is that the second series of statements are admissible under Williams because it was not a deliberate attempt to set up a two-tiered system. This agent was operating, if you read Salgado, which is what ICE agents generally are going by, the administrative questions are not. They're not required under Miranda. Isn't that a question that the court could resolve? Yes. I think the court could very well do that and avoid the question of whether the plea should not be withdrawn if those statements are still admissible. Well, let me ask a question on that, and that is do you think that that question, that is whether the plea agreement allows for withdrawal of the guilty plea under a ruling which says the statements must be suppressed but evidence of identity and fingerprints does not need to be. Would you like the district court or should we decide? I think both. You can decide it, but if you want to, you could submit it to the district court because the deliberateness aspect of it does seem to imply findings by the court that would go to the heart of whether the— But deliberateness has nothing to do with fingerprints and identification. No, that part, you're right. So we could decide that. I'm just talking about statements. Oh, absolutely. You can go ahead. This defendant is guilty based upon, as you said, the A file, which, by the way, was virtually introduced at sentencing because the defendant didn't concede anything about his prior records, so we had to have a mini-trial at sentencing to prove that he had the prior convictions. So the A file was laid out before the court through testimony of agents at sentencing, and that's the essence of the charge. The grobbing of this offense is that somebody has been previously deported, and you prove that the best evidence of that, of course, is the administrator of the government record of it. I thought this was a relatively simple case when I got into it, but obviously it's more complicated. As far as the argument that somehow these officers were violating state law, there's simply no evidence of that under the standards that the Oregon Supreme Court set in the Rodriguez case. Justice Gillette's opinion in that case makes it clear that they're not acting for the purpose of detecting or apprehending. That's what the statute says. Well, it depends upon how you define or what the purpose is. Well, I think that Rodriguez does that. They're obviously on the street for the purpose of executing their normal duty. Right. But they obviously also detained or arrested Morales for the purpose of an immigration violation. So which is the relevant for the purpose of? Well, they thought that they were executing a warrant. They didn't know exactly what type. And that's wrong. Okay, so that was just whether it's a mistake or just careless or whatever. There wasn't a warrant. There wasn't a warrant. Right, but they thought there was. Here's my question, and that wasn't very artfully phrased, but Rodriguez, as I understand it, says, look, they've got to be acting for the purpose of enforcing the immigration law. Here, plainly, they were doing their day job. So that wasn't for the purpose of enforcing the immigration law. But they see Morales, and they go, aha, I know that guy. He's wanted for immigration purposes. So in detaining or arresting him, they are acting to detect and apprehend someone for the purpose of violating the immigration law, aren't they? I think they would probably be. The same could be said in Rodriguez when the state officers were helping immigration officers. They were there to see if there were any state violations, but they were also there to give any tactical or security. But in this case, they weren't looking at a state crime possibility. I mean, they weren't saying, this seems to be the guy who just robbed the 7-Eleven, and oh, by the way, he's also here illegally. There was nothing else going on here. They noticed him because of the information they'd received regarding what they thought was an immigration warrant. But there's nothing in Rodriguez that prevents officers from doing that in the line of their regular duties, because according to Rodriguez, it's not a violation of the statute if the officers are not there, for purposes of detecting or apprehending the defendant. They weren't there for that purpose. They were there to do their day job, their regular job. And they did very little, by the way. They just kept him there long enough for the ICE agent. They just arrested him and detained him for an hour plus. No, for about 10 minutes before Billiston showed up. He wasn't even handcuffed. He was sitting on the street. They didn't ask him any detailed questions. They didn't write reports because he wasn't their case. Which seems to make the case that it wasn't their case because they were holding him for an immigration. I think that they would agree with that and would agree with it, that they were not immigration. Their purpose in being there was not to enforce the immigration laws. Now, if this is to be suppressed under Rodriguez, I think that's taking it one step farther, because Rodriguez makes clear that even if there were a violation, there would not be suppression under the exclusionary rule. And that was made clear by Justice Gillette's opinion in that case. But nothing in the state statute says that officers who were doing their normal duties, who were there because they're required to be there to enforce state law, and in this case do the livability mission to see if homeless people are okay, if they're there for that purpose. There's nothing in Rodriguez or in the statute that says they can't do that. The purpose of that statute was to prevent state officers from going out on immigration sweeps, from doing exclusively that type of work. Well, isn't that what this turned into pretty quickly? An immigration sweep. Well, I don't know what a sweep implies. There are many people involved, but there was nothing else that they wanted from him. Bottom line I'm hearing from you is that you concede that the statement should be suppressed. The first statement, yes. The statement, I've been deported. You concede the first statement about being deported should be suppressed. You agree that if one reaches, and I don't quite understand how one doesn't reach the Williams issue, that remand is appropriate on that issue. Yes. And you agree that that obviates the need for us to decide what to do about the conditional foot. That's correct. Is there anything else that we need? Not my share of questions. I'd be glad to sit down if you have some. I did want to say one thing. I don't think my brief was a so what brief. It went on for 38 pages or so, and I think I tried to do my best with the law, and my attitude is not so what. So what? That's right. All right. Ms. Hay. Thank you. I wanted to address Rodriguez quickly because I disagree with the government's interpretation of that. We don't need to get there if the sequence of events that I just went through is what we did. Your Honor, I think you do need to address the issue of whether the Fourth Amendment was violated when the police officer stopped Mr. Morales-Puerto, because that's a separate reason for suppressing his statements. What difference does it make? I mean, as long as we have one valid reason, do we really care whether there are two, three, four, five, ten? Well, I think it matters. The government just conceded it. If the supervisors understand that Oregon law was violated, I think that can make a difference in the case. In addition, we'll just be back here again if the district court says, okay, well, we're going to keep those statements out, the first statements but not the second statements under Williamson. We'll be back again, and we'll have the same issue. So I think the issue does need to be decided, whether Oregon law was violated when they stopped him. You understand the point. The statements are things. If the statements are suppressed, it really doesn't make much difference why they're suppressed. They're out. End of. Right? If they're fully suppressed. Send it back for a Williams analysis. It has nothing to do with the original arrest and whether the arrest was lawful or not. We've said it wasn't. We suppressed the evidence. It has everything to do with whether there was a cure of Billison's un-Miranda-ized statements. Right? Yes, although I think the Billison argument only cures the lack of Miranda warnings. I don't think that if the officers illegally arrested Mr. Morales-Correto to begin with, they can eliminate the taint of that unlawful arrest by later giving him Miranda warnings. I think there's not an intervening event between the questioning. Your Honor, I guess I see the analysis separately. I don't want to go over. I see the time has passed. Oh, okay. You see it separately. I see that the Fourth Amendment violation requires its own analysis and that the Williams analysis might not resolve the Fourth Amendment question. If the district court rules in our favor and keeps all the statements out, then yes. If the district court allows in statements based on Williamson, then I think we're still back in front of this court on the Fourth Amendment violation about they shouldn't have stopped him to begin with. So all of those statements. Because they lacked probable cause. Excuse me? Because they lacked probable cause. Right. They shouldn't have stopped him. They had no probable cause. So what else do we need to talk about? If they had no probable cause and those statements should be out, then I think it's all of the statements, then we don't get to Williamson analysis. All right. Thank you. Thank you, Your Honor. Okay. Counselor, I appreciate your argument. The matter of this argument will be submitted, and so it will stand in recess for the day.
judges: Rymer, Graber, Bea